JOHN DOE, ON DEMISE OF FLORENTIO COMMYNS, ET AL., *vs.* WILLIAM K. LATIMER, TENANT, &c.

Where a *concession* of land in 1817 by the Spanish authorities of West Florida was made " subject to the conditions prescribed in the regulations of 17th July, 1799"—and the decree of concession concluded with an order " that the land be surveyed and marked by the surveyor, to be submitted to the superior authority—costs to be taxed"—and no further steps appeared to have been taken to comply with the conditions or to complete the grant, anterior to the cession of the Floridas by Spain to the United States— Held, that such concession is not evidence of title.

A government or individual who makes a grant of land upon a condition precedent, may waive or dispense with a compliance therewith, so long as it, or he holds the reversion; but when it, or he conveys that reversionary interest, the right to do so ceases.

A grant of land, by the description of " the tract of land at the point of the Flag Staff," and without any further designation, to give a place of beginning for a survey, is void, for being so uncertain that locality cannot be given to the land.

Writ of Error to Escambia Circuit Court.

The case is stated in the opinion of the Court.

John Doe, on Demise of Florentio Commyns, et al., *vs.* W. K. Latimer, &c.

*Anderson,* for Plaintiff in error:

The evidence proposed to be offered to the jury, and which the Court below ruled out, was opposed upon the following grounds:

1. The incapacity of Masot, the Governor of West Florida, to make a valid grant.

To this objection it is replied, that the Supreme Court of the U. S. have decided in the cases of Sanlard, (4 Peters Rep.) Arredondo, (6 Peters Rep.,) Clark, (8 Peters Rep.,) Mitchell, (9 Peters Rep.,) and others, that upon the production of a grant the presumption of law arises that there was full authority to make it, unless the contrary be shown. By the comity of nations the tribunals of all Countries are to presume that every public officer of a foreign Government acts within the legitimate sphere of his duty till the contrary be shown.

In the absence of the Intendant, the Governor was the highest officer.

Intendant Cabannos left the Country in 1815, and there was no officer of that grade in West Florida afterwards. The grant in question was made in 1817. The authority quoted from 8th Peters is not applicable to the then condition of West Florida. As proof of this, see testimony of Caro as to 81 grants made by Gov. Masot, having been confirmed by the U. S. Commissioners.

Grants made by the Governors of East Florida in the absence of higher authority, acknowledged as sufficient. U. S. *vs.* Perchman, 7 Peters. U. S. *vs.* Fernandez, 10 Peters. U. S. *vs.* Lequi, 10 P. R. U. S. *vs.* Chaires, 10 Peters. U. S. *vs.* Leton, 10 Peters.

2. The evidence was opposed on the ground that the grant wanted *finality,* and was only preliminary to a complete title.

This objection is met by the terms of the grant itself. Governor Masot, says: "The 800 arpens of land *are hereby granted* to the said Francisco Rocheblave," &c. The word *hereby* imports that the act then done by the Governor conveyed a consummate title.

See the evidence of Caro as to similar grants, and the cases above cited as to similar grants in East Florida.

3. The evidence was opposed on the ground that the grant wanted sufficient certainty.

The tract of land in question is designated in the papers as "The tract commonly known by (as) the Point of the Flag Staff." It

John Doe, on Demise of Florentio Commyns, et al., *vs*. W. K. Latimer, &c.

might have been made sufficiently certain by other evidence, if the rejected evidence had gone to the jury as a foundation. The lessors might have proved possession in their ancestors. Though 800 arpens are sued for, and the whole might not have been recovered for want of a survey. The plaintiff in ejectment might recover a *part* of what is described in his declaration.

Lessee of Patton *vs*. Cooper, 1 Cooke's Rep., 133. The right of possession to the point of the Flag Staff, is distinct from the right of possession to 800 arpens of land—the former needed no survey to be rendered certain. It was error to deprive the plaintiff of the additional evidence.

4. It is objected in the arguments of defendant's counsel, that there was no evidence of a compliance with the regulations of Morales.

It is only necessary to reply to this, that the question does not arise upon the exceptions, it was a question for the jury.

5. It is objected lastly that the evidence of Rocheblave's title was not evidence of the title of the lessors.

It is not pretended that it was in itself—it was offered as a link in the chain. Francisco Rocheblave was the ancestor of the lessors as would have been proved to the jury, had not the plaintiff been arrested in making out his case by the Court in rejecting the foundation of his title.

*Yonge*, for Defendant in Error:

I. That the Court properly ruled out the answer of Caro to question as stated in the first exception, as well for the reason there stated to wit: That it was not the best evidence of which the case in its nature was susceptible, (Greenleaf's Evidence, 93,) as for the further reason that it was immaterial to the issue, if nothing did appear upon the records of his office that showed that the Spanish Authorities did not require the performance of conditions of land grants, that fact was not material to the issue. And it was immaterial for two reasons. *First*. The absence of such record would not prove that they did not require performance of such conditions, for there was no reason *that the records* of *his office*, should show anything about it. And *secondly*, it was immaterial, because if the Spanish Authorities chose in their munificence to dispense with the performance of conditions of such grants, it was as a boon to the grantee.

10

The United States by their treaty with Spain contracted that " all grants of land made before the 24th January, 1818, by his Catholic Majesty or by his lawful authorities in said territories ceded by his Majesty, shall be ratified and confirmed to the persons in possession of them to the same extent, that the same grants *would be valid,* if the territories had remained under the dominion of his Catholic Majesty." It is clear that this and all conditional grants would not have been valid under the dominion of his Catholic Majesty, until the conditions had been performed or dispensed with, and the United States did not agree to dispense with conditions.

II. In ruling that the paper writing purporting to be a grant from Governor Masot to Rocheblave, should not be permitted to go to the jury as evidence of title, the Court decided rightly for the following reasons:

1st. That the grant, if grant it be, is void for uncertainty.    4 Bacon's Abridgement, Title Grant.

It is essential to the validity of a grant, that the thing granted be so described as to be capable of being distinguished from other things of the same kind, or be capable of being ascertained by extraneous testimony.    Buyck et al. *vs.* U. S., 15th Peters, 223, 224, 225.    O'Harra's case, 15th Peters, 281, 282, 283.    Delespine's case, 15th Peters, 319.

The sheriff would not know what lands to deliver into the possession of the plaintiff, should he recover judgment and obtain his writ of possession.

III. The paper purporting to be a grant, is not a grant that conveys any legal title, but is only a preliminary step towards procuring a final and complete title.    See Regulations of Morales, 2 White, 235, Art. 4, 15, 16, & 18.

" The word grant may comprehend both the incipient and complete title."    U. S. *vs.* Clarke, 8th Peters, 450.

IV. The power of granting lands was not vested in the Governor of West Florida at the time this grant was made, but in the Intendant.    United States *vs.* Clarke, 8th Peters, 451 & 452.

V. The grant is void, for the reason that the conditions which attached to it, by the operation of the regulations of Morales, under which it was made, have not been shown to have been complied with.    Buyck's case, 15 Peters, 222.    O'Harra's case, 15 Peters, 281, 282.

VI. Grant void for want of survey. U. S. *vs.* Miranda, 16th Peters, 156.

VII. The title claimed is at best but an equitable one, and though it presents such a case as the Court established for the purpose of adjudicating land claims growing out of Spanish grants might possibly recognise, still there is shown no legal title, and ejectment cannot be sustained on an equitable title. Swayze and wife *vs.* Burke, et al., 12 Peters, 23.

VIII. No deraignment of title from the grantee to the lessor of plaintiff.

" Person who is supposed to have demised the premises must be shown to have had a legal power to demise." 12 Johns., 185.

DOUGLAS, Chief Justice, delivered the following :

This is an action of ejectment, instituted by the plaintiffs in the Circuit Court of Escambia County, against William K. Latimer, tenant in possession, to recover a tract of land claimed under a concession alleged to have been made by Masot, Governor *pro tem.* of the Province of West Florida, to one Francisco Rocheblave, on the 25th day of November, 1817. The declaration, notice, consent rule, and plea, (upon which issue was joined,) are in the usual form. At the last November term of that Court, the cause came on for trial, and the issue was submitted to a jury, who returned a verdict for the defendant, upon which verdict a judgment was duly entered, upon which this writ of error is prosecuted.

The following bill of exceptions is set out in the record, upon which all the errors complained of in this case are assigned, viz :

Be it remembered, that, on the trial of this case of John Doe on the demise of Florentio T. Commyns, *vs.* William K. Latimer, the plaintiffs offered in evidence of their title to the premises in controversy a paper writing, of which the following was proved to be a true translation, to wit :

### PETITION.

*To His Excellency, the Governor and sub-delegate of Royal Finance:*

Francisco Rocheblave, an inhabitant of this town, with due respect, says: that being desirous to make an establishment, and knowing that the tract of land commonly known by the point of the Flag Staff is vacant, he humbly entreats your Excellency that you have the goodness to grant him eight hundred arpens in

John Doe, on Demise of Florentio Commyns, et al., *vs.* W. K. Latimer, &c.

the place described above, a favor which he hopes to receive from the equity of your Excellency.

    [Signed,]    ·    FRANCISCO ROCHEBLAVE.

PENSACOLA, November 13th, 1817.

### DECREE.

PENSACOLA, *November* 24, 1817.

Let the Surveyor General report whether the lands prayed for by the petitioner are vacant, and of the Royal Domain; and if being such, let this pass to the view of the Seignor Fiscal of Royal Finance.

    [Signed,]        MASOT.
    [Countersigned,]        JOSE CEVALLOS.

### SURVEYOR'S REPORT.

*To His Excellency, the Governor and sub-delegate :*

The tract of land prayed for by the petitioner at the point of the Flag Staff is vacant, and there is no difficulty that it should be granted to him—nevertheless, your Excellency will decide as you may think proper.

    [Signed,]        PEDRO REGGIO.

PENSACOLA, November 23d, 1817.

### FISCAL'S OPINION.

The Fiscal of Royal Treasury, having seen the petition of Francisco Rocheblave, praying for eight hundred arpens of land at the place indicated, and for the purpose expressed by him, the same being vacant, according to the report of the Surveyor, Pedro Reggio, says that your Excellency may, if you think proper, grant him the tract of land of eight hundred arpens in the spot designated, the Fiscal considering him provided with sufficient means for the undertaking as it required, remaining subject to the conditions prescribed in the regulations of 17th July, 1799, and that he shall not alien it to any foreigner, conformable to justice which he asked.

    [Signed,]    MANUEL ARMIREZ.

PENSACOLA, November 24, 1817.

### NOTIFICATION.

On the same day we made it known to Francisco Rocheblave, which we certify.

    [Signed,]        LAUSA,
    [Signed,]        CEVALLOS.

On the same month and year, before Jose Masot, Governor *pro.*

*tem.*, for the Province of West Florida, and sub-delegate of Royal Treasury in the same, personally appeared Francisco Rocheblave, for the purpose of taking the oath required by the preceding Fiscal's opinion, and having done so in a legal manner, said that the tract of land which he solicits he wants for himself—that no foreigner has any share in his solicitation, and less will he alienate it to any such persons. He declares that the above statement is the truth under the oath he has taken and signed it with his honor, and we the assistant witnesses, to which we certify.

[Signed,]     FRANCISCO ROCHEBLAVE,
DOMINGO LAUSA,
JOSE CEVALLOS.

### DECREE OF CONCESSION.

PENSACOLA, 25*th November,* 1817.

In consequence of the report of the Surveyor appointed, that the land solicited by the petitioner is vacant, and of the Royal Domain, he having also taken the oath required by his Honor the Fiscal of Royal Treasury, the eight hundred arpens of land are hereby granted to the said Francisco Rocheblave in the spot designated. Let them be surveyed and marked out by the Surveyor, to be submitted to the superior authority. Costs to be taxed.

[Signed,]     MASOT,
DOMINGO LAUSA,
JOSE CEVALLOS.

Jose E. Caro was then sworn, and said that he was well acquainted with the hand-writing of Masot, Governor, and sub-delegate of Royal Finance of West Florida, whose name is affixed to said paper writing, and of Manuel Armirez, Fiscal of the Royal Treasury, and of Cevallos and Lausa, witnesses of assistance, having often seen them write, and that he believes the signatures of the same to be genuine ; but that he is not acquainted with the hand-writing of Pedro Reggio, Deputy Surveyor, never having seen him write, but that he has seen his name affixed to a great number of grants, afterwards approved by the United States Land Commissioners, and that this signature resembles all the others, and he therefore believes this to be his genuine signature. Deponent further says that Intendant Morales left in 1813, and that Cobannos was appointed in his stead, who also left here in 1815, after which time there was no officer here answering to that of Intendant. That

the power to sell lots was in 1813 vested in the Cabildo, and that Governor Masot made some eighty grants of land similar in form to the grant above set forth ; that, at the time this grant is dated, there was no Intendant, but there was one in Havana, who ratified and confirmed two grants made by Masot for large grants of land—one of 7,000 arpens, and one for 3,500. Pedro Reggio was Deputy Surveyor, and received his appointment from the principal surveyor, who resided in Havana ; that, when Morales was here, in him was vested the sole power of granting land, and this grant is in the same form with the others made by Masot.

The plaintiff further asked said witness if it was customary after 1813 for the Spanish Government to grant complete title to lands, without requiring proof of the performance of conditions of cultivation and habitation? The witness answered that there was nothing in the records of his office, that shewed that the Spanish authorities in a single instance required compliance with the conditions.

The Court ruled out this answer, on the ground that the record must be produced, it being the highest evidence, to which decision the plaintiff excepts.

The Court decided that the above paper writing should not be permitted to go to the jury as evidence of title, to which decision the plaintiff also excepts, and prays the Court to sign and seal this bill of exceptions, which is accordingly done.

The following are the errors assigned :

*First.* When the plaintiff on the trial of said cause asked the witness, Joseph E. Caro, if it was customary after 1813 for the Spanish Government to grant complete titles to lands, without requiring proof of performance of conditions of cultivation and habitation ; and the said witness answered, that there was nothing in the records of his office that showed that the Spanish authorities in a single instance required compliance with the conditions. The Court ruled out the answer, on the ground that the record must be produced, being the highest evidence.

*Second.* When the plaintiff offered as evidence of title of the lessor to the premises in controversy a paper writing, of which a true translation is set forth in said plaintiff's bill of exceptions, and proved the same by the witness, Joseph E. Caro, as set forth in said bill of exceptions, the said Court decided that the said paper writing should not be permitted to go to the jury.

In regard to the first error assigned, it may be remarked, that both

the question to, and the answer of the witness, appear to be wholly immaterial.   There is nothing in the record to show that any application was made after the year 1813, to the Spanish authorities in the province of West Florida, by any one holding a conditional concession, for a *real* or *complete title*, or that the question in any way arose whether a title would be granted without a compliance with the conditions or not, nor does it appear that the witness, Mr. Caro, kept an office in which, if there was any record evidence that the Spanish authorities had required the performance of such conditions, such evidence might be supposed to exist.   Had it been shewn, however, that Mr. Caro was keeper of the Public Archives, and had charge of the records and documents left by the Spanish Government on the transfer of the province to the United States, which we think likely (from the shape of the question put to him by the plaintiff,) was the fact, still the answer (which by-the-bye was not at all responsive to the question,) is wholly immaterial, because the question to be settled is not whether it was customary for the Spanish authorities in West Florida, after the year 1813, to require proof of cultivation and habitation before granting complete titles to land, but whether such proof was required by the laws, royal orders, and regulations in force in the Province after that time on this subject.

That a Government, or an individual, who makes a grant of land upon a condition precedent, may waive or dispense with a compliance therewith, and convey a full, absolute and complete title without a performance of it, so long as he holds the reversion, and the interest of no one else can be in anywise prejudiced by such conveyance cannot be doubted.   But when he conveys that reversionary interest to a third person, his right to do so ceases.

Here the Spanish Government had by the treaty of cession between it and the United States of the 22d of February, 1819, transferred its whole and entire interest in the public domain in the Floridas, including all such reversionary interests, to the latter.  See U. S. Statutes at Large, 258.   And their interests, it is apprehended, are governed by laws, ordinances, and regulations referred to.   The Spanish authorities of the Province of West Florida, may have had very good reasons (or such as they may have deemed good,) for relaxing the rule or dispensing with a compliance with such conditions in individual instances, or indeed including a general class of claims which might not apply to this, and if they did, would not affect the legal question.   They may have dispensed with a compliance with the

conditions, because the grantee had been unfortunate, or perhaps by some act of Providence may have been rendered unable to perform them, or because after the concession was made, the grantee had rendered some important services to the Government. Governor Kindelan relaxed the rule requiring performance of such conditions in East Florida in 1815, on account of Indian hostilities, so far as to grant absolute titles to settlers who had actually built houses and improved their lands, although the *ten years* settlement (then required by the regulations of Governer White,) was not complete.— 2 White's New Rec., 288. See White's regulations as to occupation and cultivation.

The relaxation of the rule by the Spanish authorities in certain cases for special reasons, would not and could not affect the general rule prescribed by the laws, ordinances, and regulations then in force.

In the case of the United States *vs.* Kingsley, 12 Peters Rep., 486, it was strongly urged in behalf of the claimant, that no instance was known of lands so decreed having reverted to the class of public lands, for the non-performance of the conditions. This is like the negative testimony offered in the case before us. Here no proof of any such current of cases appears, or is shewn to have been offered, and after the year 1815, the Intendant, the *superior authority* to whom the *process verbal* was to be sent, and who alone it would seem had the right to dispense with performance of the conditions upon which a grant was made, did not as we are informed by the testimony of Mr. Caro, reside in the Province.

The power to grant lands was in October, 1798, reconferred on the Intendant (from whom it seems to have been for a time withdrawn,) so far as respected Louisiana and West Florida, but this order did not extend to East Florida. There it remained with the Governor. The United States *vs.* Clark, 8 Peters, 452. And nothing is shewn or even suggested to take this case out of that rule.— Whether therefore the Court erred or not in ruling out this answer of the witness, Mr. Caro, it does not vary the case of the plaintiffs. They have sustained no injury by its rejection, and where a party has sustained no injury by the rejection of admissible testimony, he cannot avail himself of the mistake to reverse the judgment.— Smith *vs.* Ruecastle, 2 Halsted's Rep., 357. Overby *vs.* Paine, 3. J. J. Marsh. 717. Bosley *vs.* Chesapeake In. Co., 3 Gill and John., 450.

John Doe, on Demise of Florentio Commyns, et al., *vs.* W. K. Latimer, &c.

We proceed therefore to the discussion of the second error assigned which we think cannot be sustained for several reasons. The document the rejection of which is assigned for error, is called a Grant, which may comprehend both the *incipient* and the complete title.—– The greater number of those in Florida appear to have been of the *first* description. Many of them contained conditions, on the performance of which the right to demand a complete title depended. The United States *vs.* Clark, 8 Peters, 450. The one now under consideration is of this description. It purports to have been made by Masot, Governor *pro tem.*, of West Florida, and sub-delegate, &c, on the 25th day of November, 1817. At that time the regulations of Morales were in full force, and were the laws of the Province of West Florida on the subject of the granting of land. Ibidem.— The first article of these regulations provided that to each newly arrived family (*a chaque famille nouvelle,*) who are possessed of the necessary qualifications to be admitted among the number of cultivators of these Provinces, and who have obtained permission of the Government to establish themselves on a place which they may have chosen, there shall be granted, for once, if it is on the bank of the Mississippi, four, six or eight arpens in front on the river, by the ordinary depth of forty arpens, and if it is in any other place, the quantity which they shall be adjudged capable to cultivate, and which shall be deemed necessary for pasture of his beasts, in proportion, according to the number of which his family is composed, understanding that the concession is never to exceed eight hundred arpens. 2 White's New Rec., 234.

The report of the Fiscal in the case now before us, considering the petitioner provided with sufficient means for the undertaking required, appears to have been made with an especial view to this, and to the 4th article, and the quantity of land in this concession is we see extended to the maximum allowed to be granted.

The fourth article of the regulations provides that "the new settlers who have obtained lands shall be equally obliged to clear and put into cultivation in the precise time of three years all the front of their concessions of the depth of at least two arpens in the penalty of having the lands granted *remitted to the domain*, if that condition was not complied with. 2 White's New Rec. 234, 235. In this case no proof whatever appears of a compliance with these conditions.

There were three classes of grants made in the Floridas. *First,* absolute grants in consideration of services already performed,

11

which were made by the Governors in special cases, either in virtue of special power recognised by the laws of the Indies (2 White's New Rec. 38, 40, 52) or by the authority given in particular decrees coming directly or indirectly from the sovereign, as in the case of grants conferred upon Ygnacie Salens, Don Manuel Paulin and Don Juan Perchaman by Governor Estrado of East Florida pursuant to a Royal order March 29th, 1815. 2 White's New Rec. 280. *Second.* Grants in consideration of services to be performed, and deemed specially important, for the improvement of the province. These do not seem to have grown out of any law or Royal order, but were not unfrequent for some years before the cession of Florida to the United States. Ibid. 286, 289, 290. *Third.* But the greater number of cases was that of gratuitous grants in moderate quantities for purposes of actual occupation and cultivation. To this class is applicable the general system of Spanish land law, which existed in Florida and Louisiana, and the regulations embraced under it are as clear and distinct as those of the laws of the United States. It is true the grants were gratuitous but the performance of the conditions annexed by that law, was a consideration as explicit as the payment required by our laws.

The United States *vs.* Wiggins, Arguendo, 14 Peters 340. The regulations in regard to these grants are first found in the laws of the Indies promulgated by the King of Spain in 1682. By these laws grants were distributed by the Governors to settlers, on condition that they should take actual possession of the lands granted in three months and build upon and cultivate them, and after four years of such occupation they were entitled to hold the lands in absolute property. White's New Rec. 48, 50, 51. The *incipient* grant called a concession, was deposited in the office of the Governor's Secretary, but on proof of the necessary occupation and cultivation the settler received an absolute grant or (as it was called) a *Real title* (*a titulo de propriedad*) which was recorded in the office of the Escribano or Notary of the Province. Ibid. 282.

The quantity to be given to each settler was not prescribed by the laws of the Indies, but the Governors were directed to graduate it and it was different in different Provinces. These regulations were subsequently recognized by the King of Spain in his Royal orders of 1735, 1754 and 1768. Ibid. 62, 64 & 71. The United States *vs.* Clarke, 8 Peters 450. And in the latter it is declared that, "where any shall not apply themselves in a proper manner to improve the

lands allotted to them the same shall be taken from them (which I do said the King *without mercy*) and granted to others who will fulfil the conditions."

In the case of the United States *vs.* Wiggins above cited, the grant was for three hundred acres which she asked the Governor to grant her on the eastern side of the pond of St. George, as she had five children and five slaves with herself. The decree of the Governor is in the following words viz. "The tract which the interested party solicits is granted to her without prejudice to a third party and for the security thereof let a certified copy of this instance and decree be issued to her from the secretary's office.

[Signed,] ESTRADO."

This grant it will be perceived is (like the one now under consideration,) without any express condition as to occupancy and cultivation upon the face of it, but it was made when the regulations of Governor White were in force in East Florida, which required the grantee to take possession of, and cultivate the land within six months from the date of the concession, and to continue to occupy and cultivate them for ten years to acquire the right to an absolute title. And Mr. Justice Catron who delivered the opinion of the Court in that case after discussing the question as to the validity of the title paper (a certificate of Aguilar, Secretary of the Government, at the time when it bears date) says: "The next question is, does the concession convey with it the conditions *imposed by law* on those having lands given them? By the regulations of Governor White published in 1803, it was provided that all concessions without time specified, shall be *void*, if the grantees do not appear to take possession of them within the term of six months. In the concession to Mrs. Wiggins, no time is specified for the settlement, and the Government of the United States (said the Court) may take advantage of the non performance of the conditions prescribed by law if the 8th article of the treaty with Spain does not provide for the omission. It stipulates that grants of land made before the 24th day of January, 1818, shall be ratified and confirmed to the persons in possession of the lands, to the same extent, that the same grants would be valid if the Territories had remained under the dominion of Spain." Ibid. 349, (and see 8 United States statutes at large 258.)

"That perfect titles (continued the Court) made by Spain before the 24th day of January, 1818, within the ceded Territory are in-

trinsically valid and exempt from the provisions of the 8th article, is the established doctrine of this Court, and need no sanction from the legislative or judicial departments of this country.

"But there were at the date of the treaty, very many claims whose validity depended upon the performance of conditions in consideration of which the concessions had been made and which must have been performed before Spain was bound to perfect the titles.— That a Spanish concession carrying on the face of it a condition the performance of which is the consideration for the ultimate perfect title is void unless the condition has been performed in the time prescribed by the ordinances of Spain, was determined by this Court after the most mature consideration, in the case of the United States *vs.* Kingsley, 12 Peters 476 to 479 which is the leading decision upon the imperfect titles called Mill Grants, and which has been followed by all others coming within the principles, there, with so much accuracy, laid down."

The concession to Mrs. Wiggins, said Mr. Justice Catron, carrying with it the conditions *incident to settlement rights*, by the ordinances and usages of Spain, a brief notice in addition to what has already been said will be taken of the regulations and ordinances, and after referring to the treaty and to an ordinance published by Governor Coppinger of East Florida, on the 25th of November, 1818. 2 White's New. Rec. 282, 282. The United States *vs.* Kingsley, 1 Peters 481, he proceeds: "From the ordinance it appears that concessions made to foreigners for large or small portions of land, conveying their documents with them (which shall be certificates issued by the Secretary) without having cultivated or even seen the country granted to them, such concessions are of *no value or effect*, and should be considered as not made, because the abandonment has been voluntary, and that they have failed in complying with the conditions prescribed for the encouragement of population," and therefore there is no reason why they should not revert to the class of public lands making *null* titles of cession which were made to them.

This is an adjudication of one of the highest tribunals, Executive, Legislative and Judicial, of the Government under which these grants were made,—one possessing ample power over, and master of the subject, and has been followed by the highest judicial tribunal of our Country in the case which we have just now cited. In that case the Court, after a most full and thorough investigation and discus-

sion of the merits of the claim of the appellee, concluded by saying: " Ten years had been the time required for cultivation and occupation ; this rule was not rigidly adhered to, but the titles were perfected in some instances where valuable improvements had been made, and the occupation had been short of ten years, the Governor taking into consideration the disturbed state of the Country.— These exceptions were abatements of the general rule requiring *ten years* cultivation and occupation. As Mrs. Wiggins *never cultivated* or *occupied* the land claimed, she took no *interest* under the rule, or *any exception* made to it, and it is free from doubt that had Spain continued to govern the Country *no title* could have been made to her, nor can any be claimed of the United States as successors to the rights of Spain."

We have availed ourselves very fully of this case because it was most thoroughly and elaborately discussed and examined ; is a leading case as to this class of grants, and is we think a direct authority as to the concession under consideration. The decree in that case was made upon a concession which in all its essential features is precisely analagous to that of Rocheblave. It is in point too, upon the position assumed, that exceptions in the practice of the Spanish authorities as to particular grants, did not establish a rule for others, and is, we think, upon the whole decisive of this case upon the points we have been discussing. The concession to Rocheblave was made with express reference to Morales' regulations which bear date 17th July, 1799. See 2 White's New Rec., 244.

The Fiscal in his opinion said " your Excellency may if you think proper grant him the tract of land of 800 arpens in the spot he designates *remaining subject to the conditions prescribed in the regulations of 17th July*, 1799 ;" evidently referring to those of Morales there being no other of that date. The only difference therefore between the two concessions appears to be, that the grant to Mrs. Wiggins was to be void and held as though not made, if she did not appear to take possession and cultivate within the term of *six months* and Rocheblave was "obliged to clear and put in cultivation in the precise term of *Three Years*, all the front of his concession of the depth of at least two arpens on the penalty of having the lands granted *remitted to the domain* if this condition was not complied with." We have seen the effect of her non compliance, viz : that she took *no title* under her concession. He did not comply and the lands granted to him were *remitted* by operation of law, *to the public domain*.

John Doe, on Demise of Florentio Commyns, et al., *vs.* W. K. Latimer, &c.

But there was another condition or requirement in the concession to Rocheblave to be complied with, before the grantee could claim an absolute or real title. The concession itself upon its face required that the lands, the 800 arpens, should be measured and marked out by the surveyor, to be *submitted to the Superior Authority*, the same it is presumed of which the witness Mr. Caro speaks when he says, " that at the time this grant is dated there was no Intendant, but there was one at Havana who ratified and confirmed two grants made by Masot," from which it is (we think) fairly to be inferred that after the survey and demarkation was made the whole matter was to be *submitted to the superior authority*, for its sanction, and every one at all acquainted with the practice of the Spanish provincial governments in relation to these matters is aware that it was the business of the grantee to see that his survey was made and to pay the "*costs to be taxed*," and generally they were pretty heavy. Hence the reason probably why so many tracts remained unsurveyed. The surveys were made by the public surveyors, but it was the duty of the grantee to attend and point out the lands he had selected, and if such were not the general rule, it is the one that seems to have been prescribed by Masot in this case, and the concession being so vague the survey and demarkation was necessary to sever *these lands* from the public domain, as that was not done, they remained a part of it and were at the cession transferred to the United States. This is shewn by the case of the United States *vs.* Forbes, 15 Peters 178, 183, and the United States *vs.* Miranda, 16 Peters, 160, where the case of Forbes is cited and commented on. Forbes in his petition for the land after describing it said " the survey of which I will produce as soon as the tranquility of the province enables me," &c.

And in adjudicating upon that grant the Supreme Court of the United States laid much stress upon the circumstance that he had failed to do so. The concession or grant (for these terms as used in regard to Spanish titles in Florida are synonymous) to John Forbes said the Court, was for 10,000 acres in the district or bank of the river Nassau, with an order that the concession should serve him as "*a title in form*," and it was the duty of the party, said the Governor in the concession, to produce the plat and demarkation in the proper time. This is no more than the order in the concession to Rocheblave. No survey of the land granted was ever made in Forbes' case. " The duty imposed upon him (say the court) to produce the plat and demarkation in the proper time was never per-

JANUARY TERM, 1848. 87

John Doe, on Demise of Florentio Commyns, et al., vs. W. K. Latimer, &c.

formed." This grant was *rejected* because its calls were two *indefinite ;* a difficulty which the survey and demarkation would have avoided. In the case of the United States vs. Miranda (before referred to) 16 Peters, 160, the Court say : "Courts of justice can only adjudge what has been granted, and declare that the lands granted by the lawful authorities of Spain are separated from the public domain. The grant now sought to be confirmed (said the Court) was not so *separated by survey,* or any such *distinctive call,* as will admit of survey." And here it may not be amiss to remark that the words, shall serve him as "a title in form" in the grant to Forbes are at least equivalent to the word "hereby" in the concession to Rocheblave, which it is insisted conveyed "a consummate title," yet they were not understood by the Supreme Court as conveying any thing more than the incipient title, nor were they considered as relieving Forbes from the duty and necessity of procuring and submitting the survey.

The Court in the case of Miranda refer to the undertaking of Forbes above mentioned to produce a plat and demarkations and his failure to do so, and say, " this was a condition he assumed upon himself. The execution and return of the survey could only *sever* the land granted from the *public domain.* No particular land having been severed from the public domain by John Forbes his was the familiar case of one having a claim to a large section of country unlocated, &c. In such a case the government has ever been deemed to hold the fee unaffected by a vested equitable interest, until the location was made according to the law of the particular country."

In grants of land with uncertain designations, to be made in a large district of Country they must have been *severed from the public domain* by a survey, or be void for want of identity. The same doctrine was held in the case of the United States vs. O'Hara, 15 Peters 275. The United States vs. Delespine, 15 Peters, 317.—Buyck vs. the United States, 15 Peters, 215, and the United States vs. Lawton et al., 5 Howard's S. C. Reps. 10.

Indeed the settled doctrine of the Supreme Court of the United States in respect to these Florida grants is, that grants of land embracing a wide extent of country, or within a large area of natural or artificial boundaries and which lands were not surveyed before the 24th of January 1818, and which are *without such designation as will give a place of beginning for a survey,* are *not* lands withdrawn

from the mass of vacant lands ceded to the United States in the Floridas, " and are *void* as well on *that account* as for being so uncertain that locality cannot be given to them." The United States *vs.* Miranda, 16 Peters, 160, 161.

The Court most fully concurs with the Supreme Court of the United States in that opinion and considers this grant as it presents itself for their consideration, as one of that description. Rocheblave in his petition to the Governor for the land says " being desirous to make an establishment, and knowing that the tract of land commonly known by the point of the Flag Staff is vacant, &c. Here then is the description, " the tract of land commonly known by the Flag Staff." The surveyor in his report speaks of it as " the tract of land at the point of the Flag Staff." Neither of these descriptions convey any very definite idea, or fix any definite point for the commencement of a survey. It seems quite probable from the description of the tract given by the grantee and the surveyor, that it had obtained the name of " the tract of land by or at the point of the Flag Staff." But what was the extent of the tract whether only 800, or whether 8000, or 8,000,000 arpens, or how it was situated, what were its boundaries, whether there ever was a flag staff upon it, or in the region of it or not, or whether there is or is not any specific starting point for a survey upon it or not, is not shewn by the grant itself, nor do the pleadings or evidence in the record inform us. It must be borne in mind that this is an action of ejectment in which the plaintiff's if they recover at all, must recover upon the strength of their own title, and not upon the weakness of that of the defendant. Runnington on Ejectment, page 15. McHenry on Ejectment, page 115. Tillinghast's Adams on Ejectment, page 32.— Hodsden *vs.* Staple, 2 Term Rep., 684. Doe on the Demise of Crowe *vs.* Baldware, 5 Term Rep. 110. Doe on the Demise of Haldane and Urry *vs.* Harvey, 4 Burrows Rep. 2487. Walker *vs.* Carlter, Addison's Rep., 390. 1 Smith's Leading Cases, 152.— 2 Greenleaf's Evidence, page 266, Sec. 231. The plaintiffs must shew a paramount legal title in themselves or they cannot recover. Swayze and wife *vs.* Burke, 12 Peters, 12, 23.

And the defendant may set up an outstanding title in a third person as a defence, Lane *vs.* Simms Lessee, 9 Wheaton's Reps., 515. Runnington on Ejectment, 15. McHenry on Ejectment, 115.

All concessions or *incipient* spanish grants were made without injury to a third person. Sometimes it was so expressed in the con-

cessions, but if it was not so expressed the exception was implied by law. In the case of the United States *vs.* Heirs of F. M. Arredondo and others, 13 Peters, 134, the court says. " If upon the survey it shall be found to interfere with previous grants to third parties the concession must be lessened in quantity according to the extent of the rights of such third parties."

Suppose then that this grant had been permitted to go to the jury as evidence of title and the lands called for by it, had been covered by older valid grants, it is not perceived how the defendant could have availed himself of that fact in his defence. It would seem that his right to do so would have been defeated by the vagueness of this concession ; a reason sufficient of itself for its exclusion.

It is alleged, however, on behalf of the plaintiff, that this grant " might have been made sufficiently certain by other evidence, if the rejected evidence had gone to the jury as a foundation."

It is also insisted that the objection that, " there was no evidence of a compliance with the regulations of Morales," is a question "that does not arise upon the exceptions, but was a question for the jury."

This, however, as the matter is presented to us, we think a misapprehension. It would have been a question for the jury had evidence of such compliance been given in the Court below. But this Court cannot intend that there was any other evidence than that stated in the bill, and every bill must be considered as presenting a distinct case, which if defective in any material point, cannot be supplied by intendment. Dunlap *vs.* Monroe, 7 Cranch, 270.

If parol evidence to explain a deed be excepted to, the bill must state the evidence, so that the Court above can decide whether it was admissible or not. Gateman *vs.* Burrows, 3 Call, 194. (King *vs.* Kenny, 4 Ham. 79. McDougal *vs.* Flemming, Ibid. 388. 1 United States Digest, 415, No. 96.) The Court will not presume facts that do not appear on the bill. Jackson *vs.* Bellew, 2 Porter's Rep. 29. Cravins *vs.* Grant, 4 Monr., 126. Where parol evidence is excluded which might be proper when connected with a record, the bill of exceptions should state that such record was offered, otherwise it will be presumed that the parol evidence alone was offered. McDowell *vs.* Burwell, 4 Rand., 317.

In this case the concession being excluded, which according to the position assumed, might have been proper with parol evidence to show a compliance with the conditions prescribed by Morales' regu-

12

lations, and to define the location (if it could be defined,) the bill of exceptions should have shewn that such evidence was given or offered to be given.    And where evidence not admissible in itself, but which might have become  so  by being connected with other  evidence, is rejected by the Court, and  a bill of exceptions filed, the bill ought to state that such other evidence was offered, otherwise it will not be presumed.    Courtenay *vs.* Commonwealth, 5 Rand., 666.

In this case it is not pretended that the grant was in itself evidence but that it was offered as a link in the chain.    It ought therefore to have been shewn by the bill of exceptions that the evidence to supply the other links in the chain was offered.    There is no difference (in effect) between a statement in a bill of exceptions, that certain facts were proved, and that evidence was offered of them.    Reggin *vs.* Petapsco In. Co., 7 Harr. and John., 279.

The regulations of Morales which profess to be made, " That all persons who wish to obtain lands may know how to ask for them, and on what *conditions* lands can be granted," 2 White's New Rec., 234, go on to provide, Art. 15, page 238, that all concessions shall be given in the name of the King by the General Intendant of the Province, and directs that a survey shall be made, &c., and a *process verbal,* specifying the manner, &c.    And in article 16, directs that the *process  verbal* with a certified · copy of the  same shall be sent to the *Intendant* to the end that on the original there be delivered by the consent of the King's Attorney General, *the necessary title paper,* to which was to be annexed  the certified copy of the process verbal.    And if nothing further appeared this itself would shew that until all this was done, the right of the grantee  was *inchoate* and *imperfect,* and that the legal title remained in the Government.

But in article 18, Morales says: "Experience proves that a great number of those who have asked for lands, think themselves the legal owners of it ; those who have obtained the first decree by which the surveyor is ordered to measure and put them in possession, others after the survey has been made,  have  neglected to ask  the *title of the property,* and such like abuses continuing for a  longer time will augment the confusion and disorder which necessarily results.

" We declare that no one of those who  have obtained  the said decrees, notwithstanding, in virtue of them the survey has taken place, and that they have  been put in possession, *can  be regarded as owners of the land,* until  their *real titles* are delivered completed

John Doe, on Demise of Florentio Commyns, et al., *vs.* W. K. Latimer, &c.

with all the formalities before recited." Rocheblave had no survey, and never so far as the record shews, was ever put in possession of these lands. It is very evident, therefore, that under the Spanish Government he was not the owner of this tract of land, and we are not aware of any principle by which his right to it can have acquired any additional strength by the cession and transfer of the Floridas to the United States.

We are therefore clearly of opinion that this concession is not evidence of title, and that it was properly ruled out by the Court below.

Hitherto we have said nothing in regard to the power of Governor Masot to make these incipient grants of land. It was not necessary to the decision of this case that we should question his general power to do so. But it may not be improper for us to remark that if this grant is to be understood (as the counsel for the claimants seem to understand it,) as embracing the land on which the flag stood, and that was a flag staff used by the Government for Naval, Military or Commercial purposes, we do most strongly question whether the making it by Governor Masot would ever have been sanctioned by the superior authorities to whom the survey and the *process verbal* were (as we have seen) to be submitted and from whom the *title paper* was to come.

Upon full and careful examination of this case, we are of opinion that there is no error in the record and proceedings of the Court below and the judgment is therefore affirmed.

*Per Totam Curiam.*